Case number 18-226 et al. National Lifeline Association et al. Petitioners v. Federal Communications Commission et al. Mr. Heitman for Petitioners National Lifeline Association et al. Mr. Goyal for Petitioner Coral Creek Sioux Tribe. And Ms. Sue Dearest for correspondence. Good morning.  I'm John Heitman, and I represent Petitioners National Lifeline Association, ASIST, Boomerang, and Easy Wireless. The fourth report in order is arbitrary and capricious. Because the Commission failed to consider the impact of its decisions to ban resellers and to limit Tribal Lifeline service to rural lands on the very low-income consumers, the Tribal Lifeline program is designed to help. As the Court recognized in its order granting a stay, these rules will result in the mass disconnection of Tribal Lifeline subscribers. The Commission simply ignored record evidence that showed that the challenged rules would leave up to two-thirds of all Tribal Lifeline subscribers with no service and no way to call 911, to get a job, to talk to a teacher, to schedule a doctor's appointment, or to simply stay connected to family and community. Because the Commission failed to account for a lack of affordable alternatives or even alternative service providers for many Tribal Lifeline customers, it failed to consider important aspects of the problem before it, rendering its decision arbitrary and capricious. Turning to specific rules, the Tribal Facilities requirement is arbitrary and capricious because the Commission failed to consider the impact of the rule on affordability and subscribership. For nearly two decades, the Commission has consistently recognized that affordability and subscribership are not just a goal, but the primary goal of the Tribal Lifeline program. No other FCC program serves this need. Instead of performing a meaningful assessment of the impact of its Tribal Facilities requirement on affordability and subscribership, the Commission speculates, quote, directing enhanced Lifeline funds to facilities-based services makes those services more affordable and competitive for low-income consumers. However, the Commission failed to perform any analysis of any kind to identify what services it was talking about, where those services are actually available, whether Tribal Lifeline services will be made available by facilities-based providers that don't offer them today, or whether such services will be affordable and comparable to the services that Tribal Lifeline subscribers already rely on. Moreover, the Commission's speculation actually conflicts with record evidence demonstrating that the elimination of services provided by wireless resellers in particular would make service less affordable. You don't dispute that a policy goal of the Commission to build out last-mile infrastructure is a good thing? Your Honor, I do think that it's a good policy to build out last-mile infrastructure, and the Commission has several And consistent with the statutes, right? Yes. Consistent with the statute, the mandate for universal service. But the Lifeline program is not about necessarily where facilities don't exist. By its very nature, providing a discount on services that are available, it's about where facilities already are in place. So in 2000, when the Commission established the Tribal Lifeline But can't the Commission make the judgment that in the long term, the needs of the Tribal members will be best met if you build out the last-mile infrastructure? I think the Commission could make that decision, and I think it has made that decision in other dockets, right? But in this case, in the history of the Tribal Lifeline program, it has always been about affordability and where networks already exist. And, yes, I think it was a secondary goal of the program to incent more deployment of tribal lands. And the idea is that the Is the problem here simply that the Commission hasn't adequately explained its emphasis on infrastructure? I think that is one problem. Or is there something more basic going on? I think that's one problem. I think under the Encino Motorcars case, for example, if the Commission wants to repurpose this program and change it from an affordability program to primarily an infrastructure program, it needs to explain that and acknowledge that change and then square it with the history and the precedence that brought it to this day and understand what it's doing and has to explain to the people and address serious reliance interests of tribal people who are on this program that it's doing something else with these funds. Can I ask you, in order to have a reseller, there has to be infrastructure in place, right? That's correct. And if you withdraw the reseller, then the facility owner will not take up the slack? I think that's right, Your Honor. I think the facts are in the record. Not one major wireless network owner in the United States, not Sprint, not Verizon, not AT&T, not T-Mobile, provides lifeline service in any meaningful way, and certainly not tribal lifeline service. They have chosen voluntarily to resell, to partner with resellers and wholesale their networks. Why? Because resellers are more efficient at reaching this population and they don't have to incur all the burdens that it takes to serve this population. It is a high-cost population to serve, and the lifeline program has significant compliance requirements that AT&T, in particular, called out as something it wanted to avoid. Why isn't it just as probable that the facility owners, like Sprint and so on and so forth, are not in the market because the resellers are able to undercut them and price the service lower than they could? But if you withdraw the resellers, then maybe they will. No, I mean, what's the logic in saying that the facility owners won't fill the vacuum? Your Honor, the facility owners haven't filled the vacuum. The facility owners, this rule, it doesn't change one thing, right? The facility owners already have access to the tribal lifeline program. They already have access to the subsidy. They have chosen uniformly not to take advantage of it. In terms of the resale and the argument that the resellers undercut the facilities-based providers on price, this is unlike wireline, where wireline resale is compelled by the Act. Wireless resale is not compelled by the Act. It's completely voluntary. Sprint and T-Mobile and Verizon, for example, voluntarily wholesale their networks and partner with companies like Boomerang, like Assist, and Easy because these companies are more efficient at serving this population, and they don't want to incur the expenses of serving this population or complying with the thicket of commission rules that govern this program. Was part of your argument that it's not only that you're cutting out the resellers, but also the last mile requirement is arbitrary and capricious in itself because even a facility-based provider doesn't necessarily all the time have the last mile. It may be somebody else's. I think that's correct, particularly acknowledging that 90% of the lifeline program is wireless at this point. And so the mobile nature of that service means the last mile moves. It moves with me. It moves with you. And so you can't always tell when the consumer is being served by that company's spectrum, and that's why these companies have roaming agreements, and that's why they have resale agreements and other partnerships to serve customers wherever they might go. And so in this case, the last mile facility is something that's really hard to get. These spectrum licenses cost millions if not billions of dollars. They're not auctioned every day. And so it is not like a wireless reseller today could buy spectrum to serve their customers and provide the mobile service that they do because they need mobile service that follows them wherever they go. Do you want to save your time for rebuttal? Yes, thank you. Good morning. Good morning. May it please the Court, Shiva Goyal representing Petitioner Crow Creek Sioux Tribe. There's a button on the side if you want to raise the podium. Sure. Thank you. Thank you, Your Honor. Crow Creek is here because the FCC's order would drastically reduce the ability of Crow Creek and similarly situated tribes to access affordable communications. Now, that outcome is flatly contrary to the order's own statement of the commission's objective, which was to, quote, increase availability and affordability on tribal lands. Now, the disconnect between what the commission's stated objective was on the one hand and what would actually happen on the other is the product of two fundamental errors in decision-making that I'd like to talk about today. The first, as Mr. Heitman suggested, and as the panel of this Court already concluded, the commission neglected to consider that for many tribes, there is no facilities-based wireless carrier willing to provide lifeline service. And what that means is targeting support to facilities-based providers doesn't shift funds from one type of provider to another type of provider. It often shifts funds from one type of provider to nobody at all at a tremendous cost to the access the order sought to promote. Second, the commission unreasonably assumed that by limiting the tribal subsidy to facilities-based carriers, more lifeline dollars would go to investment, when the record actually suggested that the investment the commission was trying to promote would dry up. Now, on the first point, the practical problem facing Crow Creek and other tribes like it is this. So following up on Judge Randolph's question, would your point be that some sort of transition period would have, at a minimum, been required in the sense that maybe down the road the majors would fill in the gap? Your Honor, I think the problem is more fundamental than that. No, I understand that. I mean, I understand that's your position in your brief, but I just wanted to follow up on the judge's question. Sure. So Judge Randolph had asked a question about... What's the logic? What's the logic? Yeah. Will facilities-based providers pick up the slack, I think he asked. And the answer to that question is no, and there's certainly no evidence of it on the record. Not a single facilities-based wireless provider that has left Lifeline said they would rejoin if resellers are eliminated. And, in fact, the record showed that these large facilities-based providers, the largest ones in the country with the largest networks in the country, have been relinquishing their very right to participate in the Lifeline program. They haven't been keeping the door open. I don't want to get in the weeds here, but I thought there was some reference to Sprint providing. Sure. And, Your Honor, Sprint is the only among the four biggest carriers that participates meaningfully in Lifeline, but they do not participate in tribal Lifeline. Now, again, to the point of Judge Rogers and Judge Randolph, in addition to relinquishing their right to participate in the program, these large carriers were clear about why they didn't want to participate. AT&T said, quote, the administrative burdens were too significant for the amount of support available, and that amount of support isn't changing from this order. Now, the other reason you can't really expect facilities-based providers to pick up the slack, so to speak, is that- So the rule doesn't-does the rule prohibit any kind of subsidy? It's only the extra subsidy for the tribes, right? That's right, Your Honor. Are these-do these have to be federally recognized tribes? Yes. I believe so, but I'm not sure. Crow Creek is a federally recognized tribe, and I would add that the enhanced tribal subsidy is, I think, about roughly two-thirds, if the math works out, certainly over 60 percent of the subsidy that a tribal Lifeline provider would get. So I guess my question is, would the resellers withdraw? Because instead of getting $25 or $29, they're only getting $9? We certainly saw some evidence of that at the state stage and in the state papers and on the record before the commission. And, look, if resellers fell short of complete withdrawal, certainly there would be a reduction in service. If they're getting almost $35 in a subsidy now, which is what the commission determined would be needed given the affordability crisis in tribes with concentrated poverty, dropping that down to $9.25 is going to result in a loss of service. So to take the Navajo Reservation, the Checkerboard Reservation, which I'm sure you're familiar with, if you have one parcel in this checkerboard that is non-Indian, that is owned in fee simple by non-Indian individuals, and then the adjacent checkerboard square is Navajo, and it's remote. The people in the non-Indian section only get $9, and the people in the Navajo section get $35? Is that the situation? Your Honor, I think that might depend on how tribal lands is defined by the FCC. And I know it's not limited to reservations alone, but I frankly don't know exactly the answer to that question. Isn't that one of the questions that is now under consideration in the new rulemaking, about whether there should be a division between, you know, if you're remote, you're remote, right? Whether you're a Native American or whether you're, you know, whatever. Sure, Your Honor. That is an issue that the Commission has considered, but when it adopted the Tribal Lifeline Subsidy, it did so because of an affordability crisis, not just because of the difficulty of serving rural areas with infrastructure, but because of an affordability crisis and because of specific statistics showing that the adoption of basic Should we make anything of the fact that you all haven't raised your procedural arguments here? No, Your Honor, and we're happy to argue them. Frankly, these substantive issues that we're raising, the consumer harm, the lack of access to a facilities-based wireless carrier, these are issues that we think we could have shown the magnitude of to the Commission had it observed proper procedure. But in 2016, March of 2016, the Commission said we're declining to adopt the rule. We're not prejudging it in a future where we'll examine tribal issues, not just with Lifeline, but with other universal service programs. They stopped the record. There was no reason at that point to continue filing and predict that this order might come through and talk to some of the tribes that have come out of the woodwork since the order was adopted, tribes like Leech Lake in Minnesota that participated with declarations at the state stage before this court and said we've got the exact same problem. And for an analytic issue that goes to the heart of the order's core justification for what it was doing, showing the Commission by coordinating with other tribes that this is a real issue and it's a big issue was clear prejudice. Let me press a little bit here. One of the arguments being made, it seems to me, by the Commission is that the record has all this data in the sense that the history of this whole Lifeline program, et cetera, establishes that there's a need, that there's a problem, and the Commission says essentially my words, not its words. Even the dissenting opinions show that the Commission was aware of some of the key facts that you're arguing. So my question is what specifically would a notice and comment period that was adequate in your view have allowed the tribes to do? One of the points you make in your brief is that they could have talked about alternatives to some of the things that the Commission adopted. And there was a comment I think in an ex parte letter that in order to provide meaningful comment on the definitional change, the Commission had to make the maps available. Are there other specific things that would have come up where tribes, you mentioned one tribe didn't even know about it, and I gather even the draft was not available from the Federal Register. That's right, Your Honor. The draft was not available in the Federal Register, and it only gave you two weeks to say anything about it. But to your question about what specifically we could have said, one is, as I mentioned before, the size of the problem, the size of the problem that the Commission did not even bother to acknowledge, let alone defend the order against in the order. Another thing we could have discussed at the same point is, look, a lot of time passed since the first comment cycle in late 2017 when the order was adopted. What happened during that time? The problem that we're talking about got bigger. The largest facilities-based carriers continue to pull out. They continue to apply for relinquishment of their license, their authorization to provide lifeline in states around the country. Well, the original comment period was 30 days, right? I believe it was longer than that, Your Honor, including the reply phase. Well, I'm not including the reply. Just the original comment period was 30 days in the 2015 Notice of Proposed Rulemaking. And here it was 14 days, you say? It was. From the notice to the final. So from the draft order, which, you know, we don't believe is as such. But the point you made, you just made, you know, I understand it. But did you ever, on behalf of your clients, did you ever ask that the original comment period, the 30 days plus the 60 days for reply, be reopened in light of additional evidence? Sure, Your Honor. So after the draft order was released, that's when. No, not the draft order. I mean, between the period when the 2015 Notice of Proposed Rulemaking came out and before the fourth order, and you say there were developments, did you ever ask to reopen the comment period? So, Your Honor, if we're talking about the period between the end of the comment cycle in 2015 and the release of the draft order, is that the right time frame? Right, yeah. Intervening events gave us every reason not to expect that this order would come out without the commission on its own seeking further comment. And that. What were the intervening events? The intervening event was the commission's adoption of its 2016 Lifeline Modernization Order, where in paragraph 211 of the order the commission said, without prejudging rules like the tribal facilities requirement and the tribal rural limitation, without prejudging those issues, we're not adopting them today, we'll hold them open in a, quote, future proceeding that is more comprehensively focused on tribal broadband deployment. No reasonable person could have understood those words to mean what the commission has said it means in its brief, which is an order adopted in a Lifeline-specific proceeding. There are two problems. An order is not a proceeding under the APA or the commission's own rules. And second, an order in a Lifeline proceeding necessarily does not consider matters outside Lifeline and therefore is not more comprehensive than the proceeding as it exists today. So by the commission's statement in the 2016 that there was a future or further consideration of a future proceeding, are you suggesting that because of that there was no incentive for you on behalf of your clients to ask for the original 2015 comment period to be reopened in light of additional evidence? That's correct, Your Honor. We thought the matter had been effectively closed until further notice from the commission.  Anything further? No, Your Honor. All right. Thank you. Good morning. Good morning. Good morning. May it please the Court. My name is Thyla Sundresen, and I represent the Federal Communications Commission and the United States. There have been a number of issues discussed this morning. I'm happy to address them. I'd like to begin by touching briefly on the order's rural limitation. The commission recently determined to target Lifeline's limited resources toward the areas that had the lowest rates of connectivity, the most costly communication services, and overall the greatest need, and those are rural areas. As the order explains, only 37% of residents of rural areas have access to high-speed service as compared to 98% of residents in urban areas. What effect was that going to have on overall subscriptions? Your Honor, with respect to the subscribership issue, what is important to remember here, and Judge Randolph, you had highlighted this, wireless resellers can continue to participate in the Lifeline program. They can also continue to offer service in tribal lands. But did the commission take a look at what the likely effect was going to be on overall subscription? Well, Your Honor, in the order we do acknowledge that currently two-thirds of the enhanced support is going toward wireless resellers. Implicit in that is that only one-third is going to carriers, and we recognize there are not enough carriers currently on reservations to service tribal lands. In paragraph 27, we say that ultimately over time we believe that targeting the funds, the enhanced support toward the only carriers that are capable of deploying, building, and maintaining infrastructure on tribal lands will long-term lead to more robust networks and ultimately will help drive subscribership. But in the interim, wireless resellers can continue to offer service. There are wireless resellers across this country, Your Honor, that service rural non-tribal lands who only get the $9.25 basic subsidy. I think you understand your opponent's argument, and that is that the policy had been, the position had been that we're interested in affordability so that more disadvantaged folks can get subscriptions, right? And that the commission seems to have turned that on its head and said, no, our interest is in building out infrastructure. And in doing so, that the commission has overlooked, has neglected the primary purpose, at least as established in the 2000 Order, of affordability for tribal members. How do you respond to that? Sure. The 2000 Tribal Order, which adopted the enhanced support, there were dual goals. Certainly affordability was a goal, but so was telecommunications deployment on tribal lands.  It sounds like I'm looking at the 2000 Order. It says, our primary goal is to reduce the monthly cost of telecommunications services. It doesn't sound like it's a dual goal. It sounds like the primary goal is affordability, so that tribal members who qualify would be able to have subscriptions at a lower rate. Your Honor, and later in that same order, we also say that one of the key impediments that prevents service on tribal lands is the fact that deployment is languishing on tribal lands. This is not a decision that we made in a vacuum. In footnote 67 of the order under review, we have comments from over a dozen tribes who endorsed the facilities-based requirement here because they recognized that the tribal infrastructure on tribal lands was woefully inadequate. We also received comments from facilities-based. I thought we were talking about the rural limitation. I think that's what you're starting with. Yes, Your Honor, I am. And the point of the rural limitation was to direct the funds where the needs are the greatest, and those are indisputably on rural tribal lands. But is the effect of that going to be reduced number of subscribers? Aren't you leaving the urban tribal members behind is the argument. Your Honor, we're not. So one reason I already explained. That suggested that you thought maybe you were, at least for a period of time, right? Well, I think we have to acknowledge that in the short term, there could be some loss in subscribership, although it's not necessarily so, so for a couple of reasons. One, as I mentioned, because the wireless resellers can offer a basic lifeline plan. So as we mentioned in pages 52 and 53 of our brief, Assistant Easy Wireless, on their websites they currently offer basic tribal plans, or I'm sorry, basic lifeline plans, where they offer 750 minutes of voice, unlimited text, a certain amount of data. That's a pretty good phone plan, and they haven't presented any evidence that their tribal subscribers are using more than what is offered under a basic lifeline plan. How much do they cost? I'm sorry? How much do they cost? They're free. They're free, Your Honor. Their lifeline, I would say the vast majority, if not upwards of 90%, if not more, they receive their phones and their plans for free. So let me be clear. They're going to put Verizon and AT&T and Sprint out of business? Your Honor, no, Your Honor. Well, they're offering free service. Well, that's the purpose of the enhanced subsidy and the basic subsidy, to help offset costs. But for the consumer, the lifeline plan has always been free. That's part of the problem, Your Honor, that lifeline is an incredibly expensive program. In the order we talk about the need to prudently manage our fund expenditures, in paragraph 28 of the order, last year disbursements were over $1.2 billion. The commission is entitled. Don't you agree, won't you, that the record shows that the budget anticipated such growth? The budget did anticipate growth, certainly. However, we believe that the expenditures have skyrocketed since 2007. But my point is, didn't the budget anticipate that? To this extent, no, Your Honor, no, Your Honor. Let me ask you, in the record, are there any statements under oath by any of the major carriers that they intend to pick up the slack? Your Honor, the commission does not necessarily envision that the large carriers will be participants in the lifeline program. But can you just answer my question? No, Your Honor. There is no comments from large facilities-based carriers. However, there are comments from smaller facilities-based carriers, Smith-Bagley being one of them, also in footnote 67 of the order, Hewlett-River Telecom. But you acknowledge that they opposed the rule, the 2017 rule? No, Your Honor, they did not. That's a misstatement. That is a misstatement. They originally supported it, but then they came out against it because of some of the changes that were made. Your Honor, no, that is incorrect. So in the February 2018 comments Smith-Bagley submitted, they opposed a proposal raised in the NPRM, and we know that because they cite to Paragraph 67 of the NPRM and not the order. Three weeks subsequent to that, they filed an opposition to petitions for reconsideration of the order, in which they gave an unqualified across-the-board endorsement of the order's facilities-based requirement. And I'll find that where? The excerpt of the February 2018 comments is in the joint appendix. We filed a supplemental letter on October 12th in which we attached the full set of February 2018 comments as well as the opposition that Smith-Bagley filed in March. So I'm going to find that in the supplemental joint appendix? Yes, Your Honor. As this Court has consistently held, you review the agency's decision based upon the record that was before it at the time. Petitioners include in the joint appendix post-order comments, which are typically not part of the record. We felt an obligation to the Court to correct this inaccurate statement. Thank you. Just one other quick question. Some of the statistics you gave about tribal support in footnote 67, at least one of the tribes operates its own facility. Isn't that correct? That is true. And are they among the tribes that you're relying on? So footnote 67 references comments from tribal carriers like Gila River Telecom, Mescalero Apache Telecom, San Carlos Apache Telecom, as well as tribal governments as well. So the footnote 67 references both. So what I'm trying to focus on are these providers. What volume of service is provided by these providers? In other words, is there no need for AT&T, Sprint, et cetera, Verizon? Your Honor, I think that is an important point. So I don't know specifically with respect to the tribal carriers referenced in footnote 67. I do know that Smith Bagley, whose comments are referenced in footnote 56, serves 100,000 tribal customers. Right. But the question I ask, I didn't see that fact anywhere in the commission's order. So it's in footnote 56 of the order we talk about Smith Bagley. No, no, no. That because of these other carrier sources that the tribes themselves own and operate, that will ameliorate any decrease in subscribership, much less affordability issues. Your Honor, it's not explicitly set out in the order. Is it implicitly in the order? Yes, I do believe it's implicit. Because we say in paragraph 27 that ultimately funneling these funds to facilities-based cares will lead ultimately to more robust efforts. I know, but there's nothing to back that up. I'm looking for the backup. That's why I asked you about the declarations, and I'm exploring this tribal. Because what I was left with was no indication that these tribal owners and operators were going to be able to fill the gap. It's not explicitly set out in the order. I do believe that it's- Well, what I'm trying to get at is the commission order says it expects the majors, AT&T, Verizon, to fill the gap. That's what the order is premised on. It's not this tribal community. So, Your Honor, we made a predictive judgment that funneling these funds- I understand that, counsel, and all I'm trying to find out is what is the predictive judgment based on, and you don't have any statements from the majors. And you don't reference the tribal ownership carriers. So what is the basis for this prediction? So the basis is footnote 56 of the order, which says Smith-Badley's comments said that- One carrier. Yes, Your Honor, that is one carrier that's referenced. But, however, this facility's based requirement was endorsed not by one, not by even a dozen, by nearly 20 tribes and tribal carriers and tribal organizations. Right, and I don't want to go around in circles, but my point is, if those are the tribes that already own the facilities, of course they're going to support this. I'm talking about people who are unable to afford service, who live in remote areas, and who live in urban areas and can't afford this service, who are not being served by these tribal-owned operators. Do you see what I'm getting at? I mean- Yes, Your Honor, I do understand where you're getting at. And, you know, I'm happy to assume that you're a lot more familiar with the record than I am, and that's what I'm trying to flesh out, is if I dig deeper, what am I going to find to support the Commission's judgment about what's going to happen sometime in the future, sometime in the unidentified future? So a couple of other points. So in addition to the fact that the wireless resellers can still continue to offer the basic subsidy, the other point is that even though there might not be a facilities-based wireless carrier on a tribal reservation, there could be a facilities-based wire line carrier. Having a phone in one's home is an important way of staying connected. Also, in footnote 70 of the order, it's not as though wireless resellers can just turn off service. If they are planning to relinquish their ETC designation, they have to obtain approval from the State Commission. The State Commission will evaluate whether those customers will be served by another carrier in the area. So it's not as though subscribership is simply going to plummet. But, however, the Commission made a predictive judgment, to which we are entitled great deference, that limiting the funds to the only carriers that are capable of deploying on tribal lands will ultimately lead to higher quality service. Since 2005, Your Honors, well over a decade, wireless resellers have been in this arena and have obtained the enhanced support. So we've tried this out for well over a decade. And what the Commission has realized is there hasn't been any appreciable advancement in deployment on tribal lands. So the Commission, as we say in Paragraph 1, we're taking a fresh look at this issue. So you're knocking out the resellers? We're not knocking them out, Your Honor. No, you're not knocking them out of the enhanced subsidy. Yes, from the enhanced subsidy. And that's why they're in there. I'm sorry? That's why they're in there. Well, Your Honor, Lifeline was never intended to be a program that was going to offer profits. We say that in the original. But offer affordable service. Yes, it was intended to offer affordable service. That is true. But, again, under the basic program, these phones and these plans will continue to be free for the customers. There are wireless resellers across the country that are providing service to rural, rugged, non-tribal lands that are doing it with only the basic subsidy. And what we have realized in this last decade since we have allowed resellers to come in, there has been a bloating of fund expenditures combined with waste-front abuse and collectively not any appreciable advancement on tribal lands. I want to take you back to the language used in the 2016 order. What is the commission's interpretation of the phrase that the issues we've been discussing here today would remain open in a future proceeding more comprehensively focused on advancing broadband deployment on tribal lands? So if we parse that sentence phrase by phrase, the issues remained open for consideration in that the docket remained open, people could continue to file comments and ex parte submissions. I'll parse it for you, at least one reading, is that when you talk about a future proceeding, you're distinguishing between the proceeding that was ongoing at the time and one that would be initiated later. And that's totally consistent with the APA. Your opponents say that the APA definition of proceeding means a process for gathering information. That's not correct. The APA defines proceeding as a rulemaking proceeding, an adjudication, or a licensing proceeding. So if I plug in that definition, a future proceeding, a future rulemaking proceeding seems the most likely. But that's not what happened here, because you say it was a continuation of the proceeding that was already open. Yes, Your Honor. So proceeding, our opponents have defined it as an agency process. In this context, it doesn't have to refer to an agency process of more information gathering. It can refer to the agency's decision-making process. No, I agree with you. But what it does refer to is a, forget about adjudication, forget about licensing. There's three kinds of proceedings under the APA. And the one that fits here is a rulemaking proceeding. So consideration in a future rulemaking proceeding, but that's not what happened. That's not what happened, Your Honor, because the 2015 NPRM provided ample notice and opportunity for comment. The wireless reseller petitioners here filed over 100 pages of comments, all of which are available in the joint appendix in which they oppose these proposals, and hundreds of other interested parties submitted comments in which they either supported or opposed the proposals. And if you read the petitioners' comments, they make perfectly clear they understood the parameters of the facilities-based requirement and what the impact would be on wireless resellers. In those comments, they say, if this order is adopted, wireless resellers are going to lose two-thirds of their support. I suppose I would reply that yes, but. You told us there was going to be another rulemaking, and there was evidence that was developing, as there always is, during the comment period and later while the rule was being considered by the commission, and we would have sought to reopen the comment period in light of the additional evidence. But you lulled us into not doing that by saying there's going to be a new rulemaking. What's your answer to that? We never said that. The 2016 order never said that we were going to provide another opportunity for notice and comment. And the 2015 NPRM provided ample notice and comment. Had we simply adopted the order in 2016? Well, you say it never said that we have another notice and comment period. Their reply would be, I suppose, that when you said future proceeding, the only thing that comes to mind is a future rulemaking, and if it's a future rulemaking, it necessarily entails notice and comment. What's your answer to that? My answer is that perhaps that was inartfully drafted. Maybe we shouldn't have said the word proceeding, but we never explicitly said we were going to open up for notice and comment. Petitioners had ample opportunity to file comments before in response to the 2015 NPRM and did, in fact, file voluminous comments. And at the least, you'd say it's harmless error because they already had the opportunity to provide, that we already provided notice and comment. The APA requires notice and comment, not multiple rounds of notice and comment. Anything further? No, Your Honor. We ask that the commission's order be affirmed. Thank you. Thank you. All right. Counsel for National Lifelong. Thank you, Your Honors. Just a few quick points in response to counsel's arguments. First, with respect to the tribal rural limitation, the commission asserts that it's more costly to serve rural areas, and it provides a bunch of data about fixed service on rural lands. The Tribal Lifeline Program is over 90% a mobile wireless program. It's a mobile wireless program using networks that are in place. This is a program, and for these consumers affected in the crosshairs today, they have the network. It's not about networks that aren't there. The networks are there. They're getting mobile wireless broadband, and the commission's statistics about fixed broadband on tribal lands is not particularly relevant. What would be relevant is statistics about mobile wireless service on tribal lands, and we are providing that service today. Do the facility owners maintain the towers and all the other requirements to allow phones to be wireless? Excuse me, sir? The resellers don't maintain the infrastructure. Your Honor, no, we don't maintain the infrastructure we sell, but we pay Verizon, we pay Sprint, we pay T-Mobile, and they maintain the infrastructure. We have wholesale agreements with them. The revenue that we get and we give to them goes to building out and maintaining networks in tribal lands. Putting revenue and putting customers on those networks in thinly populated tribal lands or even in those tribal lands or in urban areas, they augment the case to build facilities, and the record reflects that. Second point, with regard to the consumers could get basic lifeline plans, isn't that enough? That's exactly what the commission said wasn't enough in 2000. That's the reason why we have the tribal lifeline program. The commission had a lifeline program before it, and it said because of poverty on tribal lands and the adoption problem and affordability problem on tribal lands, it needed to do more. The basic lifeline subsidy was not enough. Moreover, the record reflects, and particularly in the petition for stay, the materials filed there, that many resellers will not stay to provide 925 service. They cannot stay in business. Why is it more expensive for the resellers to provide service on tribal lands as opposed to on other rural areas that are non-tribal lands? Your Honor, it's typically not more expensive for resellers to provide service on tribal lands. It's typically the same. The network is the same. What happens with the tribal subsidy is that tribal residents get a lot more service. They get much more robust service packages that they use. These service packages commonly include allocations of voice, text, and data, broadband data. And so these consumers are getting fairly robust packages as opposed to the consumers in the basic lifeline program, which get fairly minimalist packages. A final point on notice. The tribal facilities requirement that was adopted and the rural tribal limitation that was adopted could not have been reasonably anticipated prior to release of the draft order. The tribal facilities requirement is something that cannot be squared with over 10 years of forbearance in Section 10. And the Commission's definition of facilities, which if you look at Paragraph 30 in the order, they still intend to use for other lifeline purposes. The Commission has an obligation to explain how all those things fit together, not to mention Section 214A, which allows resale. The Commission's last mile requirement effectively outrules any resale. Could I just ask you on the definitional point, in the 2015 second further notice of proposed rulemaking, the Commission does discuss at some detail that it's considering a different type of definition. And it refers to, I think it's an agricultural program and some other programs that are very narrowly focused and based. And ultimately what the Commission adopts is something along the same lines. Is that not correct? That's the tribal rural limitation, Your Honor. And, yes, the Commission adopts the definition from its E-rate program, something it didn't propose and nobody actually commented on. And while the Commission did propose population density-based restrictions, what I think goes off the rails here is that the definition it picked includes things like urban clusters. And urban clusters include places like McCord, Oklahoma, a town of 1,500 people. And when the Commission released that draft order in November, nobody in McCord, Oklahoma, could know that they were part of an urban cluster. The Commission knew, but it kept that data to itself. So at that time nobody could comment that small towns were swept into this definition, which the Commission says is about 25,000 people. And I think the Commission has an obligation to put that definition out and let people understand how it impacts them. The Commission released a tool allowing people to enter summer over six months after the order. And, thankfully, this Court stayed these rules so that they did not go into effect.  Thank you. Council, some of the tries. Your Honor, I'd just like to pick up on a few points made in the FCC's presentation. One is back to this point of filling in the gap, of picking up the slack. Verizon withdrew from Crow Creek several years ago. They relinquished their license to provide Lifeline. They're not coming back. We're looking for other options, and our only option is resale. Now, the FCC also mentioned the smaller carriers. Well, what about that? Well, none of them said in the record. They talked about incremental expansion. Maybe I'll build another tower in my existing spectrum license area and cover some more tribes. That's all well and good. But it's not much help to tribes like Crow Creek in the Dakotas or Leech Lake in Minnesota or the Mississippi Band of Choctaw. Smithpac, neither Smithpac nor Gila that serves a tribe, they didn't say they were going to expand from the few states they serve or the single tribe they serve and go out, make a hundred, several hundred million, maybe a billion dollar business decision to buy spectrum, an entirely new state, to build a ground game to get the service out there, to build towers out there and connect the towers without an existing network. And there's a reason they didn't do it. It's an enormous business decision, and it isn't driven by the chance to get a little more of that tribal lifeline pie. I also want to briefly mention the dual goals from the 2000 order. As Judge Griffith mentioned, I thought the order was very clear about what the primary goal was, but it was also clear about what the mechanism for investment was, and that was investment through affordability. You make service more affordable in areas with concentrated poverty, and folks can afford your service, and that gives you a reason to serve them that you wouldn't have if there wasn't an addressing of affordability. What the Commission's chosen here, if we even buy the investment argument, is investment at the expense of affordability, and that is a fundamental repurposing of the lifeline program that has not been explained or defended in the order. I also wanted to briefly mention the 2016 lifeline orders discussion about future proceeding. The respondents say perhaps it was inartfully drafted. It seemed to me to be very carefully drafted. In fact, there's a footnote dropped in that paragraph that says we're going to consider high-cost policies too. And if you're going to consider an entirely separate universal service program while you consider these other rules, you've got to expand the scope of the proceeding, and the only way to do that is with a new notice of proposed rulemaking that seeks comment. Thank you. We will take the case under advisement.
judges: Rogers, Griffith, Randolph